Kuzma v Honeycutt (2025 NY Slip Op 51520(U))

[*1]

Kuzma v Honeycutt

2025 NY Slip Op 51520(U)

Decided on September 25, 2025

Supreme Court, Saratoga County

Kupferman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 25, 2025
Supreme Court, Saratoga County

Heather Kuzma, Plaintiff,

against
Jennifer Honeycutt, Defendant.

Index No. EF20232907

David H. Pentkowski, Esq.
Pentkowski & Pastore
P.O. Box 445
Clifton Park, New York 12065
Attorneys for the Plaintiff
Matthew A. Albert, Esq.
The Law Offices of Matthew Albert Esq.
2166 Church Road 
Darien Center, New York 14040
Attorneys for the Defendant

Richard A. Kupferman, J.

The Plaintiff, Heather Kuzma, is a dog breeder. She had a prize American Bully named Prince Charmer. The breeding of this Stud with another American Bully (Wyobulls Pause for Praise) resulted in a dog named Krewe. Ms. Kuzma sold Krewe to the Defendant, Jennifer Honeycutt, for $2,500.00, subject to the terms of a "Co-Ownership Contract." After a breakdown in the parties' relationship, Ms. Kuzma commenced this action seeking the return of the dog.
After discovery, the Court conducted a non-jury trial. The Court heard testimony from four witnesses and received various exhibits into evidence, including the contract, photographs, payment records, expense reports, registry certificates, examination reports, veterinary records, and dog show results, among other things. The Court has also received post-trial submissions from the parties. Now, having considered the evidence and the parties' submissions, the Court [*2]renders this decision. Issues Presented
1. Did Ms. Honeycutt breach the contract and, if so, what is the remedy?
2. Does the contract require Ms. Honeycutt to return the dog if she does not desire to continue to show the dog in sporting events or enroll the dog in a breeding program?
Background
In January 2022, the parties entered into a "Co-Ownership Contract and Purchase Agreement," the terms of which are incorporated herein by reference (see Defendant's Trial Exhibit No. A). The document was drafted by Ms. Kuzma and specifies that Ms. Honeycutt acquired the dog "as a family companion dog or as a working dog to be used for tasks [such as] conformation, weight pull, lure course, agility, . . . therapy, and service dog" (Contract, Section 5, at page 6). Under the contract, Ms. Honeycutt is required to house the dog and pay for the dog's expenses. She is also required to consider the dog "as part of [her] family" (Section 6, at page 7).
In addition to providing for the dog's well-being, the contract also seeks to promote the dog's breed and Ms. Kuzma's business. In this regard, Ms. Honeycutt agreed to "make every attempt to facilitate showing this dog so as to enable its ability to obtain at a minimum its [conformation] Championship title in at least two registries" (Contract, Section 3, at page 5; see also Section 1 [requiring four titles]; Section 4.E [requiring two conformation Championship titles and two additional titles in other performance or sporting events]). Further, the parties agreed that Ms. Honeycutt could retain the dog as a pet if the dog did not perform as expected or meet the requirements for breeding (see Sections 1, 4.E & F).
The contract imposes various affirmative duties on Ms. Honeycutt and also specifies that certain conduct may "NEVER" be performed, such as breeding the dog on back-to-back heats, breeding the dog with a merle dog, or turning the dog over to a shelter or medical testing facility. The contract further provides that Ms. Honeycutt's failure to comply with specific provisions constitutes "a breach of contract" and requires her to pay a set amount for such non-compliance. Examples of this include the improper registration of the dog; the breeding of the dog with a merle or merle gene carrying dog; and the rehoming of the dog. The final paragraph in the contract further provides that "Any breach of the contract by the Co-Owner will result in ownership of the dog reverting immediately back to [the] Breeder" (Contract, at page 9). This final paragraph further provides that the "Co-Owner will be responsible for all legal expenses incurred by Breeder in any case filed by the Co-Owner that is ruled in favor of Breeder" (Contract, at page 9 [emphasis added]).
In her post-trial submission, Ms. Kuzma contends that Ms. Honeycutt has failed to strictly comply with two specific provisions of the contract and that she is therefore entitled to the return of the dog, liquidated damages in the amount of $5,000, and attorney's fees. The first provision allegedly breached, Section 4.B, concerns monthly updates. The second provision allegedly breached, Section 1, concerns health testing. In addition to these two issues, Ms. Kuzma also objects to Ms. Honeycutt's desire to retain the dog as a pet and contends that the dog should instead be returned to her for use in sporting events and potential breeding.
Contract Interpretation
A contract should be "construed in accord with the parties' intent, and the best evidence of what parties to a written agreement intend is what they say in their writing" (Piccirilli v Yonaty, 204 AD3d 1322, 1323 [3d Dept 2022]). "Due consideration must be given to the [*3]purposes of the parties in making the contract, and a fair and reasonable interpretation consistent with that purpose must guide the courts in enforcing the agreement" (Tougher Heating & Plumbing Co. v State, 73 AD2d 732, 733 [3d Dept 1979]).
A contract "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases" (BCC Hous. Dev. Corp. v LPCiminelli, Inc., 235 AD3d 1211, 1212-1213 [3d Dept 2025], quoting Piccirilli, 204 AD3d at 1323). "An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation" (Piccirilli, 204 AD3d at 1325 [internal quotation marks and citations omitted]). Moreover, where a written contract is ambiguous, "resort to extrinsic evidence is permissible . . . and the ambiguity should be resolved against the party who prepared the agreement" (Tougher Heating & Plumbing Co., 73 AD2d at 734; see Piccirilli, 204 AD3d at 1324 n 3).
Issue No. 1:
Did Ms. Honeycutt breach the contract and, if so, what is the remedy?
Ms. Kuzma contends that Ms. Honeycutt breached two specific provisions of the contract. The first provision allegedly breached, Section 4.B, concerns monthly updates. It requires Ms. Honeycutt to "provide updates and stay in communication at least once a month with [Ms. Kuzma] to give updates as to the progress and development of the dog via quality photographs and videos."
On this issue, Ms. Kuzma testified at trial that Ms. Honeycutt stayed in communication with her during the first six to nine months of the dog's life. During this time, Ms. Kuzma was able to review photos and videos of the dog on social media. Sometime thereafter, Ms. Kuzma had a disagreement with Ms. Honeycutt's friend, Daniel. As a result of this disagreement, Ms. Kuzma elected to unfriend Ms. Honeycutt on social media (Facebook). Ms. Kuzma testified that Ms. Honeycutt stopped communicating with her afterwards.
In contrast, Ms. Honeycutt testified that she initially provided updates which she thought were sufficient. However, Ms. Kuzma indicated that she wanted something different, without adequately explaining what. Ms. Honeycutt testified that Ms. Kuzma defriended her on social media and that the communication ended completely when Ms. Kuzma involved her attorney. Ms. Honeycutt further testified that she understood Ms. Kuzma's unfriending of her on social media as a sign that Ms. Kuzma did not want to communicate with her.
The credible evidence establishes that Ms. Honeycutt originally provided the updates, however, she stopped providing them after Ms. Kuzma defriended her on social media. This caused Ms. Honeycutt to believe that Ms. Kuzma no longer desired to communicate with her. Given that Ms. Kuzma's own conduct contributed to the breakdown in the parties' communication, the Court declines to find that Ms. Honeycutt breached the contract for failing to provide the updates. Rather, the Court excuses Ms. Honeycutt's failure to provide the updates based on Ms. Kuzma's own failure to perform the contract in good faith (see NY UCC § 1-304), as well as her failure to promote "a good working relationship," which was required by the contract (see Section 4.F) (see e.g. Grace v Nappa, 46 NY2d 560, 567 [1979]).
Nevertheless, even assuming for the sake of argument that Ms. Honeycutt had breached the contract, the Court would nonetheless deny the relief sought by Ms. Kuzma. In particular, Ms. Kuzma is seeking attorney's fees, liquidated damages in the amount of $5,000, and the return of the dog. The attorney's fee provision, however, does not apply based on its plain language considering that Mr. Kuzma (as opposed to Ms. Honeycutt) filed this action. Similarly, [*4]Section 4.B does not set forth any monetary penalty or provide for liquidated damages for non-compliance.
In addition, Ms. Kuzma misplaces reliance on the final paragraph of the contract, which provides that "Any breach of the contract by the Co-Owner will result in ownership of the dog reverting immediately back to Breeder." This provision was drafted by Ms. Kuzma. It does not define the term "breach" or provide any examples of conduct that would cause Ms. Honeycutt to lose any ownership rights in the dog. This excessively broad and ambiguous provision should therefore be limited in its construction to avoid an absurd result. Indeed, an overly broad interpretation of this provision that includes minor or trivial violations would produce results that are unconscionable and against public policy. As such, the Court interprets this provision as applying to only material violations or, alternatively, to only those violations specifically identified in the contract as a "breach of contract" (which do not include the failure to provide updates or complete health testing) (see Piccirilli, 204 AD3d at 1324 n 3; see also Restatement (Second) of Contracts § 203; 1 Corbin on New York Contracts § 24.10 [Bender 2024]).
In considering whether a breach is material, the Court must ascertain whether the non-performance "is so substantial that it defeats the object of the parties in making the contract" (Ali-Hasan v St. Peter's Health Partners Med. Assoc., P.C., 226 AD3d 1199, 1201 [3d Dept 2024] [internal quotation marks and citation omitted]). In making this determination, the following factors are relevant:
"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing" (Restatement [Second] of Contracts § 241).
In considering these factors, it is readily apparent that the alleged violation did not result in a material breach. Rather, the provision allegedly breached simply required Ms. Honeycutt to provide updates (by way of photographs and videos), which were not essential to the object of the contract. In fact, based on her own testimony, Ms. Kuzma herself did not consider this obligation a material term. Indeed, even without sending the weekly updates, Ms. Honeycutt was able to continue training the dog and have him compete in dog shows. 
In addition, Ms. Honeycutt has already expended more than $30,000 to purchase the dog, pay for the dog's expenses, and train the dog, including $8,000 for service dog training. Classifying the breach as material would unreasonably deprive Ms. Honeycutt of the benefit of her bargain and unjustly cause her to forfeit her financial and emotional investment in the dog. Moreover, the alleged non-compliance is readily curable and, in fact, has already been cured during discovery by the disclosure of substantial information regarding the dog, including photographs, veterinary records, testing results, and dog show results.
Health Testing
The second provision allegedly breached, Section 1, concerns health testing. Section 1 provides, in pertinent part, as follows:
"1. Registration of the Dog
. . . . Buyer shall be responsible for achieving a minimum of four (4) titles (two of the titles must be at minimal Champion titles in conformation), and full health testing has been completed this is to include all Orthopedic Foundation for Animals recommended tests for the American Bully (BAER, CAER, Thyroid, Cardiac, Patella, Hips and Elbows) Penn Hip may be utilized for the grading of the Hips and elbows but OFA must be completed also to be submitted into the American Bully database at two years of age. These requirements mean the dog is NOT to be bred intentionally or accidentally until all of these requirements mentioned above have been completed (and proof has been submitted to the Breeder)" (Contract, Section 1, at page 3 [emphasis changed from original]).
On this issue, Ms. Kuzma testified that the dog was required to have "full health testing" and that the testing has not yet been completed. Ms. Honeycutt testified that she registered the dog in the databases and performed health testing. She also testified that preliminary testing has been completed for the dog's hips and elbows, and that any final testing was put on hold when this lawsuit was filed in October 2023, before the dog had reached the age of two. She also testified that she is willing to complete the final testing of the hips and elbows, if necessary.
At the outset, the Court disagrees with Ms. Kuzma's interpretation of this provision. While Section 1 requires "full health testing" prior to breeding, it does not refer to this requirement as Ms. Honeycutt's sole responsibility or place the entire cost on her. The plain language of Section 1 further does not provide any indication that the failure to complete this requirement would require Ms. Honeycutt to forfeit her ownership interest in the dog or require her to pay any liquidated damages.
In addition, Ms. Kuzma contends that "full health testing" was required when the dog turned two years of age. Ms. Kuzma, however, commenced this action prior to the dog turning two years old. At that time, Ms. Honeycutt reasonably decided to hold off on further testing during the pendency of this litigation, especially considering the ambiguities in the contract language and the uncertainty in the outcome of the case prior to this decision. Further, regardless of who had the contractual obligation to arrange and pay for the testing, Ms. Kuzma is just as equally to blame for the failure to complete the health testing. This case has been going on for years. She could have requested the outstanding testing to be completed as part of the discovery conducted in this action and, if necessary, she could have sought an Order compelling the testing to be completed (see CPLR 3101; 3120).
In any event, even assuming for the sake of argument that Ms. Honeycutt had breached the contract for failing to complete the testing, this alleged violation did not result in a material breach or cause any damages. The testing is simply a prerequisite to breeding. As the dog has not yet satisfied the other prerequisites for breeding (e.g., a minimum number of titles), the completion of the health testing is a moot point. Moreover, as explained above, Ms. Honeycutt has invested significantly in the dog. Forcing her to return the dog would amount to a forfeiture, especially as the Court could simply direct the testing to be performed if it were necessary.
Accordingly, the Court finds that Ms. Kuzma has failed to demonstrate that Ms. Honeycutt has breached the contract or that any such breach entitles her to the return of the dog [*5]or any of the other relief requested by her.
Issue No. 2:
Does the contract require Ms. Honeycutt to return the dog if she does not desire to continue to show the dog in sporting events or enroll the dog in a breeding program?
In her post-trial submission, Ms. Kuzma contends that the dog could be a "high performance sport dog based on his body type" and that the dog was never sold to be a "pet home only" dog. She further contends that the dog has attributes that could make him eligible for a breeding program. In contrast, Ms. Honeycutt contends that she should be permitted to retain the dog as a pet and service dog.
Under the contract, the dog was expected to participate in dog shows/competitions. Also, if he achieved at least four titles (including at least two conformation Championship titles) and had good health, he would be eligible for breeding. The parties, however, did not intend for Ms. Honeycutt to have to continue to show the dog in perpetuity. To the contrary, the contract required Ms. Honeycutt to "diligently show" the dog for at least one year, with "no less than one (1) set of two (2) shows per month" and "no less than 12 weekends in one year" (Section 5, at page 6). If she was "unable to personally complete the Dog's championship" by the time the dog was 2 ½ years old, she had the option to "either hire a professional handler (to be approved by [Ms. Kuzma]) or return [the dog] to [Ms. Kuzma] to show until [the dog] is finished (assuming [the dog] is still deemed 'show quality' by an evaluation of no less than two (2) experienced breeders/exhibitors/judges to be selected by [Ms. Kuzma])" (Section 5, at page 6). If all this work still did not achieve the results required (i.e., at least four titles with two Championship titles in conformation), the contract then permitted Ms. Honeycutt to retain the dog as a "pet" (Sections 1, 4.E & 5). 
On the issues regarding the dog's performance, the Court found the testimony of Ms. Honeycutt to be credible. She explained that she invested significant financial and emotional support to help the dog achieve his potential. She socialized him, trained him, and hired a professional handler to train him more. She also paid for all the costs associated with the dog. She has spent at least $28,000 for the dog's food, health insurance, veterinary expenses, training, registrations, testing, and dog shows. The dog has also participated in numerous shows. Ms. Honeycutt testified that the dog participated in more than 80 shows. The professional handler (Ms. Askew) further testified that she participated with the dog in at least 30 shows.
Despite these diligent efforts, the dog did not perform well. Ms. Honeycutt testified that the dog did not achieve the titles, or the results, required for performance or breeding. He did not have the looks or meet the physical standards required for show results or breeding. He is tall and thin, weighing only 80 pounds. Ms. Honeycutt further testified that she gave him ample time to develop and followed the trainer's advice. However, he has not achieved the results required. He also has mild hips and family health concerns.
The Court also found credible the testimony of two trainers, Jenna Lynn Askew (also a dog handler) and Amanda Watkins.[FN1]
Their testimony corroborated Ms. Honeycutt's opinion that the dog was not show or breeding quality. He did not have the appropriate size and lacked the height, weight, and other physical attributes (e.g., head size) for his class of show dogs. Rather, [*6]he needed to be taller and larger for his category (XL). Ms. Askew further explained that the dog was trained for the weight pull, but that he did not have the drive to succeed. She opined that he was more of pet quality and that he would be best as a pet.
Upon considering the trial evidence, the Court finds that Ms. Honeycutt has complied with these contractual provisions and that she is no longer required to show the dog at any additional dog shows or competitions. For years, Ms. Honeycutt provided for the dog's well-being and invested in his training and performance. The dog also participated in more than the number of shows required by the contract. He is now nearly four years old. Yet, he has not achieved the success required under the contract for continued showing or breeding. As explained by Ms. Honeycutt and her witnesses, the dog lacks the ideal body size and other attributes necessary to succeed in shows and achieve championship titles. It is unclear what else, if anything, could have been done or could be done for the dog that has not already been done.
Further, Section 5 of the contract sets forth two alternative options for Ms. Honeycutt to select from if she could not achieve the results on her own. Ms. Honeycutt could "either" hire a professional handler "or" return the dog to Ms. Kuzma to show the dog. As Ms. Honeycutt hired a professional handler to train the dog, she complied with this provision. Moreover, the professional handler/trainer selected by Ms. Honeycutt was highly qualified and ultimately determined that the dog was unable to achieve the titles required under Sections 1, 4.E & 5. It would therefore be unreasonable to require Ms. Honeycutt to again select another handler to repeat this same process, especially at this stage of the dog's life.[FN2]

In addition, Section 5 (which is ambiguous) could be interpreted even more unfavorably against Ms. Kuzma. One such reasonable interpretation would be to find that Ms. Honeycutt was not required to continue to show the dog after he reached the age of 2 ½ years old without Ms. Kuzma first obtaining two evaluations indicating that the dog was "show quality." As no evidence exists that Ms. Kuzma obtained any such evaluations, Ms. Kuzma has no right to insist that the dog continue to participate in any further shows.
Nor does any evidence exist that two evaluators would have or will now likely certify the dog as "show quality." To the contrary, the trial evidence establishes that the dog was unable and is now extremely unlikely to achieve the performance standards specified in the contract, including a minimum of two conformation Championship titles (see Sections 1, 4E & 5). Again, Ms. Kuzma has had more than enough time to obtain the necessary evaluations during discovery. Nevertheless, she has neglected to do so and has therefore since waived any right that she may have had to conduct these evaluations under Section 5.
The Court also declines to direct Ms. Honeycutt to enroll the dog in a breeding program. As an initial matter, the dog has not achieved the minimum number of titles necessary to participate in a breeding program (see Contract, Section 1). Nor has Ms. Kuzma established that the dog is of "breeding quality" (see Contract, Section 4.F; see also Section 1). As explained above, the dog has not been successful enough in dog shows/competitions or developed the physical attributes desired for his category (XL). He also has potential health concerns, including mild hip dysplasia.
Further, Ms. Kuzma's assertion that the dog was never intended to be used solely as a pet is a moot point considering that Ms. Honeycutt has trained and used the dog as a service dog, which is expressly contemplated under Section 5. Nevertheless, Ms. Kuzma's assertion on this issue is also erroneous. Sections 4 and 5, in particular, provide Ms. Honeycutt with the right to retain the dog as a "pet" (neutered) under certain conditions, including, but not limited to instances where the dog either (1) has not obtained "at minimal two conformation Championship in at least two registries and two additional titles in performance/sporting events of the Co-Owner's choice," or (2) "does not turn out as [a] breeding quality animal" (Section 4.E & F; see also Section 5). These provisions make clear that the dog may be used solely as a pet if it does not acquire the four titles necessary for breeding (see Sections 1 and 4).
As explained above, the dog has not been able to achieve the minimum titles necessary. Ms. Kuzma has failed to submit any credible evidence to support a finding that the dog will likely achieve the results in the future if he continues to participate in shows/competitions. In addition, as explained above, the dog also does not meet the minimum requirements for breeding. As such, the contract does not preclude Ms. Honeycutt from retaining the dog solely as a pet if she desires.
Accordingly, the Court finds that Ms. Honeycutt is not required to return the dog. She is also not required to continue to show the dog in sporting events or enroll the dog in a breeding program. The Court has further considered the parties' remaining contentions and finds them to be either rendered academic by this decision or lacking in merit. 
The Court renders judgment in favor of the defendant, Jennifer Honeycutt, and against the plaintiff, Heather Kuzma. The Complaint is hereby dismissed in its entirety. This constitutes the Decision and Order of the Court. The Court is uploading the original for filing and entry. The Court further directs the parties to serve notice of entry of this Decision and Order in accordance with the Local Protocols for Electronic Filing for Saratoga County.
So-Ordered.
Dated: September 25, 2025
at Ballston Spa, New York
HON. RICHARD A. KUPFERMAN
Justice Supreme Court

Footnotes

Footnote 1:Although Ms. Honeycutt is friends with these witnesses, the Court nonetheless assessed their credibility while being mindful of their relationship and still found them to be credible.

Footnote 2:While Ms. Kuzma did not pre-approve the professional handler selected by Ms. Honeycutt, the contract (as interpreted by the Court) would not have permitted Ms. Kuzma to unreasonably withhold her consent to the handler selected by Ms. Honeycutt.